# RICHARD E. METCALFE *v.* WALTER J. TALARSKI ET AL.
## (13599)

SHEA, CALLAHAN, GLASS, COVELLO and HULL, Js.

Argued October 6—decision released December 5, 1989

*Timothy F. Woodbridge,* with whom was *Raymond C. Seligson,* for the appellants-appellees (defendants).

*Elizabeth B. Leete,* for the appellee-appellant (plaintiff).

GLASS, J. This appeal concerns a real estate transaction that literally and figuratively went up in flames. The plaintiff, Richard E. Metcalfe, and the defendants, Walter J. Talarski, Walter L. Talarski, Edward Talarski and Cynthia Talarski, entered into a real estate sales agreement on January 22, 1985, in which the defendants agreed to sell to the plaintiff two buildings in Hartford. Prior to the closing, however, one of the buildings was completely destroyed by fire. The plaintiff then brought this action alleging that the defendants had materially breached the sales agreement by failing to maintain fire insurance on the property in the full amount of the purchase price. The plaintiff's fourth amended complaint contained three counts. In the first count, the plaintiff claimed rescission of the contract and restitution of all money paid by him to the defendants pursuant to or related to the contract. The second count claimed unjust enrichment and the third count alleged breach of contract and claimed lost profits and reliance damages. The defendants answered, and counterclaimed for rent or use and occupancy payments.

The case was tried to the court, *Hammer, J.,* which, in a memorandum of decision, found for the plaintiff on the first count, awarding damages of $157,630.59 together with interest at 10 percent from January 8, 1986, to the date of the judgment. In addition, the trial court found for the defendants on the second and third counts and for the plaintiff on the counterclaim. The defendants appealed to the Appellate Court and the plaintiff cross appealed. This court then transferred the case to itself. Practice Book § 4023.

On appeal, the defendants claim that the trial court erred: (1) in holding that their claim for rent or use and occupancy had no basis in law or in fact; (2) in awarding the plaintiff the cost of a heating system he had installed in one of the buildings; and (3) in awarding him legal fees. The plaintiff, on cross appeal, argues that the trial court erred: (1) in ruling that his claim for rescission barred him from later claiming damages for breach of contract; and (2) in awarding interest from the time of the plaintiff's demand for rescission instead of from the time of the breach of the agreement to insure the property. We find error only in the amount of the legal fees that the trial court awarded to the plaintiff; we find no error in all the other issues on appeal.

At trial, the following substantially undisputed facts of the case were revealed. On January 22, 1985, the plaintiff and the defendants entered into a real estate sales agreement in which the defendants agreed to sell to the plaintiff two buildings designated as 354 and 380 Hudson Street in Hartford. The plaintiff intended to renovate 354 Hudson Street into commercial office space and move his company, the Metcalfe Glass Company, into 380 Hudson Street. The total purchase price was $639,000, with $305,000 allocated for 354 Hudson Street and $334,000 for 380 Hudson Street. The plaintiff gave the defendants a deposit of $110,000, and the defendants were to take back a purchase money mortgage in the amount of $255,000 at 13.9 percent with respect to 354 Hudson Street. In addition, the agreement specified that the plaintiff was to obtain a Connecticut Development Authority mortgage on 380 Hudson Street in the amount of $300,000 at 12 percent, with the mortgage contingency date being on or before April 15, 1985. The closing was to take place on or before June 25, 1985. On the same day that the sales contract was executed, an additional letter agree-

ment was signed that stated if the plaintiff notified the defendants that he could not obtain the Connecticut Development Authority mortgage on 380 Hudson Street, then the defendants could offer a purchase money mortgage on substantially the same terms. If the defendants chose to exercise that option, they would then be obligated to provide such mortgage and the buyer would have a corresponding obligation to accept it "and to close the purchase or forfeit the deposit."

The sales agreement further provided that "[u]ntil the closing, Seller shall maintain insurance on the premises against fire . . . in at least the amount of the purchase price of each property." If there were substantial fire damage to the property "then Buyer shall consummate the sale without reduction of the purchase price on account of such damage, and Seller shall assign to Buyer all claims and rights under applicable insurance policies less any amount actually expended by Seller in connection with the repair or replacement of such damages." The defendants also warranted that they had not received notice from any insurance company that they were not in compliance with any standard of insurability, and that if such notice were received prior to the closing "it [was to] be Seller's obligation to provide a copy of such notice to Buyer and to remedy the violation before closing."

At the time of the execution of the sales agreement, the defendants operated a laundry business on the first floor of 380 Hudson Street and rented the second floor to a social club. In addition, 354 Hudson Street was vacant and unused except for the storage of some equipment and laundry supplies. Pursuant to the sales agreement, adjustments were to be made with respect to 354 Hudson Street as of January 3, 1985, and for 380 Hudson Street as of the date the defendants vacated that building. Moreover, the agreement stated that "[a]t the option of Buyer possession of either or both buildings

shall be provided at closing, or at any time prior to closing that Buyer may choose." The plaintiff received the keys to 354 Hudson Street when the agreement was signed and was given the keys to 380 Hudson Street when the defendants vacated on or about April 1, 1985. The plaintiff used 380 Hudson Street only to store some glass and frames for a few weeks until vandals destroyed them. The plaintiff did, however, collect $1000 by way of two months rent from the social club on the second floor before the social club ceased paying rent and left the premises. The plaintiff did not move into or occupy 354 Hudson Street. Furthermore, when the plaintiff received the keys to 354 Hudson Street, the building was in unrentable condition, with peeling paint, a fallen ceiling, buckled floors, moldy rugs, and a broken furnace. Additionally, shortly before the signing of the agreement, the pipes at 354 Hudson Street had frozen and burst, thus rendering the sprinkler system inoperable.

The plaintiff was unable to secure a mortgage for 380 Hudson Street by the mortgage contingency date of April 15, 1985. The defendants granted the plaintiff an extension until June 15, 1985, but the plaintiff was still unable to secure financing. The defendants' attorney, prompted both by the delay in the processing of the plaintiff's mortgage commitment and his concern about continued insurance coverage because the buildings were unoccupied, then arranged a meeting of the parties on September 28, 1985. At this meeting, it was agreed that the mortgage contingency date would be extended to June 10, 1986, to enable the plaintiff to secure outside financing for 380 Hudson Street. In addition, the parties entered into a written agreement that provided that the plaintiff would pay the defendants an "interest adjustment" of $6127 per month from "9/1/85 – closing," based upon the interest that the defendants would have received if they had accepted

a purchase money mortgage for the balance due on both buildings. As the trial court stated in its memorandum of decision: "The defendants' attorney testified that he had suggested that the payments be characterized for insurance purposes as being for use and occupancy of the buildings. He also stated that the plaintiff's connection with the property was the same both before and after the meeting, that the defendants were being "paid" for the further extension of the closing date and that in a sense "the purpose [of the meeting] was to confirm the sale."

In addition, the plaintiff offered evidence at trial to show that, even though he was not obligated to do so until the closing, he paid taxes on the property of $6865.92 and electricity and water bills of $1543.02. Also, when the defendants moved their laundry business from 380 Hudson Street, they removed, with the plaintiff's permission, the boiler from that building. In December, 1985, the plaintiff had a new heating system installed in 380 Hudson Street for $18,490.05 and had the fuel tank filled at a cost of $1922.60. The plaintiff also submitted proof of payment of $1700 for the cinderblocking of windows and $687 for roof repairs at 380 Hudson Street. The plaintiff additionally offered into evidence a bill, dated January 23, 1985, for $3936 from his attorney for services rendered in conjunction with the transaction.

On December 14, 1985, 354 Hudson Street was totally destroyed by fire. On December 26, 1985, the defendants sent a copy of the insurance policy on 354 Hudson Street to the plaintiff's attorney. The plaintiff then discovered that 354 Hudson Street had been insured only for $200,000 rather than the purchase price of $305,000 as mandated by the purchase agreement. In addition, the insurance company paid only $100,000 because the sprinkler system was inoperable. On January 8, 1986, the plaintiff's attorney sent a let-

ter to the defendants' attorney stating that by failing to insure 354 Hudson Street in the amount of the stated purchase price the defendants had "materially breached" the purchase agreement, and that "[a]ccordingly [the buyer] hereby rescinds the contract of sale." The plaintiff also made demand for the return of the deposit, the interest payments, and the cost of the heating system for 380 Hudson Street, as well as interest on these expenditures.

After filing suit against the defendants, the plaintiff asked the defendants' attorney to advise him of the defendants' position with respect to the sale of the property. The defendants responded by a letter dated September 17, 1986, that offered the plaintiff a credit for his deposit of $110,000 and the insurance recovery of $100,000 toward the purchase price, but also claimed that the plaintiff owed them $61,270 for ten months of rent and $10,650 in taxes, in addition to the balance due. On April 15, 1987, the defendants sold the property to another party for $525,000. The defendants wrote to the plaintiff suggesting that he remove the heating system that he had installed in 380 Hudson Street, but the plaintiff refused to do so. The defendants then salvaged the heating system for $1500.

The case went to trial on May 13, 1988. The trial court found for the plaintiff on his claim of rescission, granting him a restitution award in the amount of $157,630.59 plus interest. The court arrived at this figure by way of the following calculation:

| | |
|---|---|
| "Deposit | $110,000.00 |
| Property taxes | 6,865.92 |
| Utility bills | 1,543.02 |
| Roof repairs | 687.00 |
| Blocking of windows | 1,700.00 |
| Heating system (with credit for $1,500— salvage value) | 16,990.05 |

| | |
|---|---|
| Fuel oil | 1,922.60 |
| Interest payments to sellers | 14,986.00 |
| [Legal fees | 3,936.00] |
| | [$158,630.59] |
| Less credit for rental from tenant | 1,000.00 |
| | [$157,630.59]" |

## I

The defendants first argue that the trial court erred in ruling that their claim for rent or use and occupancy had no basis in law or in fact. In particular, the defendants assert that they are entitled by law and by the facts of this case to a set-off against the trial court's award to the plaintiff for the value of the plaintiff's use and occupancy of the buildings prior to the rescission of the purchase agreement. We do not agree.

## A

The defendants argue that they have an implied legal right to be compensated by the plaintiff for rent or use and occupancy of the premises in this case. We are not persuaded. As stated in 77 Am. Jur. 2d., Vendor & Purchaser § 573, pp. 697–98: "The relation between the vendor and the purchaser who enters or is let into possession under a contract for the purchase of land, although analogous to the relation of landlord and tenant, is not the ordinary or conventional relation of landlord and tenant; and it is generally held that no promise on the part of the vendee to pay for the use and occupation of the land will be implied, the price agreed upon being presumed to be sufficient consideration for the immediate occupation of the land as well as the ultimate conveyance of title. When a purchaser thus let into possession of land under an executory land con-

tract thereafter rescinds the contract for the vendor's default in making a conveyance, he ordinarily cannot be liable in an action at law for the reasonable value of the use of the land while in possession. . . . Where, however, the purchaser resorts to a court of equity to enforce his right to rescind, the courts, applying the general rule that a party who seeks to rescind a contract must restore what benefit he has received under the contract, require him to account for the rents and profits of the land during the time he was in possession . . . ."

Thus, although the vendee has no inherent legal obligation to compensate the vendor for rent or use and occupancy,[1] if the vendee seeks the equitable remedy of rescission, the vendee must, in accordance with the mandates of that remedy, restore to the vendor any benefit that the vendor has bestowed upon him. "Rescission, simply stated, is the unmaking of a contract. It is a renouncement of the contract and any property obtained pursuant to the contract, and places the parties, as nearly as possible, in the same situation as existed just prior to the execution of the contract. A condition precedent to rescission is the offer to restore the other party to its former condition as nearly as possible." *Kavarco* v. *T.J.E., Inc.*, 2 Conn. App. 294, 299, 478 A.2d 257 (1984). "The very idea of rescinding a contract implies that what has been parted with shall be restored on both sides, and hence the general rule, which is to be reasonably applied . . . is that a party who wishes to rescind a contract must place the opposite party in status quo." 17 Am. Jur. 2d., Contracts § 512, p. 994.

---

[1] See *Ankeny* v. *Clark*, 148 U.S. 345, 359, 13 S. Ct. 617, 37 L. Ed. 475 (1892); *Harral* v. *Leverty*, 50 Conn. 46, 51 (1882); *Little* v. *Pearson*, 24 Mass. 301, 302–303 (1828).

This "rule requiring restoration is, of course, inapplicable if the rescinding party has received nothing, and the same is held to be true if he has received nothing of value." Id., § 513, pp. 997–98. "[W]hen specific restitution of land is decreed . . . the liability of the innocent occupier . . . depend[s] on whether he has *in fact* been enriched by its use." (Emphasis added.) G. Douthwaite, Attorney's Guide to Restitution p. 325.[2] In *McCoy* v. *West,* 70 Cal. App. 3d 295, 301, 138 Cal. Rptr. 660 (1977), the vendees rescinded the contract for the sale of a commercial property and the vendor sought reimbursement for "the reasonable rental value of the business property while it was in the possession of the buyers." The *McCoy* court noted that " ' "there is no contractual relation which imposes on the vendee the obligation to reimburse the vendor for rent; it is only to the extent that the vendee has *profited* by the undertaking that he is required in good conscience to [compensate] the vendor." ' " (Emphasis added.) Id., 302, quoting *Pendell* v. *Warren,* 101 Cal. App. 407, 410, 281 P. 658 (1929). In a similar case, the Alaska Supreme Court stated: "In the event the purchaser uses the property, he must pay the seller for the reasonable value of his use. Where the property is a residence, occupied as such by the purchaser, this is measured by the fair rental value of the property. If, on the other hand, the property is commercial in nature, the purchaser must pay his net receipts, for those measure the extent to which he has benefitted." *Miller* v. *Sears,* 636 P.2d 1183, 1193 (Alaska 1981).

In the present case, the plaintiff rescinded the contract and, therefore, must restore to the defendants

---

[2] The Restatement of Restitution § 157, comment (d) states: "If the recipient was not tortious and was not more at fault than the other, he is under no duty of paying for the value of the use unless he used the land, in which case he is required to pay the reasonable value of the use or what he received therefrom, at his election."

any benefit that the defendants have bestowed upon him. It is clear, however, that although the plaintiff was in possession of 354 and 380 Hudson Street, he profited from this possession only to the extent of the $1000 he collected in rent from the social club on the second floor of 380 Hudson Street. The plaintiff received nothing else of value by virtue of his possession of the two buildings and, therefore, the trial court appropriately limited the set-off against the plaintiff's damages to the $1000 the plaintiff received in rent.

B

The defendants further argue that the trial court erred in finding that their claim for rent or use and occupancy had no basis in fact. Again, we are unpersuaded. The defendants assert that there was substantial evidence presented at trial of an agreement with the plaintiff to pay for use and occupancy. The trial court, however, ruled that such a claim had "no basis whatsoever either in fact or in law under the circumstances of this case." The trial court concluded that the $6127 per month that the plaintiff agreed to pay at the September 28, 1986 meeting was an "interest adjustment" in consideration of the further extension of the closing date,.and not a payment for use and occupancy. The trial court noted that paragraph six of the purchase agreement already entitled the plaintiff to take possession of the buildings, and that although "[t]he defendants' attorney testified that he had suggested that the payments be characterized for insurance purposes as being for use and occupancy of the buildings[, he] also stated that the plaintiff's connection with the property was the same both before and after the meeting, that the defendants were being 'paid' for the further extension of the closing date and that in a sense 'the purpose [of the meeting] was to confirm the sale.' "

This court "may reverse or modify the decision of the trial court if it determines that the factual findings are clearly erroneous in view of the evidence and pleadings in the whole record . . . ." Practice Book § 4061; see *Duksa* v. *Middletown,* 192 Conn. 191, 205–206, 472 A.2d 1 (1984). After review of the evidence and pleadings in this case, we conclude that the trial court's ruling that there was no basis in fact for the defendants' assertion that the plaintiff agreed to make rent or use and occupancy payments was not clearly erroneous.

## II

The defendants also assert that the trial court erred in awarding $16,990.05[3] in damages to the plaintiff for the cost of the heating system that the plaintiff installed in 380 Hudson Street. We disagree. The defendants removed the boiler from 380 Hudson Street when they vacated the premises, and they concede that the sales contract required them to have a functioning heating system in that building. The defendants claim, however, that this could have been accomplished for $3000 to $4000, rather than the $18,490.05 that the plaintiff spent on the new heating system.

The defendants, citing *Cohn* v. *Norton,* 57 Conn. 480, 18 A. 595 (1889), and *Hadley* v. *Baxendale,* 156 Eng. Rep. 145 (1854), argue that this expenditure was not within the contemplation of the parties at the time of the execution of the sales contract, nor was it an expense incurred in preparing to carry out the contract. The trial court, however, ruled that the installation of the heating system was done "in the course of the plaintiff's good faith efforts 'in preparing to carry out the agreement.' *Gray* v. *Greenblatt,* [113 Conn. 535, 537, 155 A. 707 (1931)]." Once again, pursuant to Practice Book § 4061, after review of the evidence and plead-

---

[3] The trial court arrived at this figure of $16,990.05 by subtracting the heating system's salvage value ($1500) from its cost ($18,490.05).

ings in this case, we conclude that the trial court's award to the plaintiff for the cost of the heating system in 380 Hudson Street was not clearly erroneous.

## III

Next, the defendants argue that the trial court erred in the amount of legal fees that it awarded to the plaintiff. Relying on *Rabinovitz* v. *Marcus,* 100 Conn. 86, 95, 123 A. 21 (1923),[4] the trial court awarded to the plaintiff $3936 in counsel fees incurred during the negotiation and execution of the purchase agreement. The defendants concede that the plaintiff is indeed entitled to legal fees related to the negotiation and execution of the sales contract.[5] The defendants maintain, however, that included in the $3936 awarded to the plaintiff were charges for legal services not related to the negotiation and execution of the sales contract and therefore not within the contemplation of the parties. Specifically, the defendants contend that included in the $3936 legal fees were charges related to: (1) the closing of a mortgage on the plaintiff's business; (2) a title insurance premium; and (3) recording fees in connection therewith. The defendants contend that although "the proceeds of this mortgage were apparently used to reimburse Plaintiff for part of his deposit and to fund the balance of the deposit, the transactions in connection with it occurred the day prior to the execution of the sales contract in this case . . . [and] nothing in the record indicates that the Defendants were ever apprised as to Plaintiff's source of funds." Thus, the defendants argue that the legal fees incurred in

[4] In *Rabinovitz* v. *Marcus,* 100 Conn. 86, 95, 123 A. 21 (1923), the court held that a plaintiff who had rescinded a real estate sales contract was entitled to recover expenses for legal services in connection with the searching of title and preparation of the papers necessary to consummate the transaction.

[5] At oral argument the defendants' counsel stated: "[Plaintiff's attorney's] fees included, obviously, expenses incurred in negotiating the contract which is the subject of the suit, with which we have no quarrel."

relation to the mortgage were not within the contemplation of the parties, pursuant to *Cohn* v. *Norton,* supra, and, therefore, were improperly awarded by the trial court to the plaintiff. We agree.

The plaintiff's attorney's bill for services rendered, dated January 23, 1985, was entered into evidence at trial as plaintiff's exhibit D. The bill indicates that $736 of the total charges of $3936 were related to the plaintiff's mortgage on his business.[6] Thus, the trial court should have reduced the amount of the plaintiff's award by $736.

## IV

The plaintiff argues in his cross appeal that the trial court erred in ruling that his claim for rescission of the

---

[6] The plaintiff's attorney's bill dated January 23, 1985, and marked as plaintiff's exhibit D at trial, reads:

"To Legal Services rendered in connection with the purchase of 354-380 Hudson Street, Hartford to date, including:

"A. Conferences with you and review of instruments both executed and unexecuted previously discussed between you and Walter Talarski;

determination that your desire to promptly execute a contract with a large deposit required a limited examination of title; performance of a limited examination of title yielding the conclusion that a recorded contract would provide you a secured position under the Purchaser's Lien Statute, Section 49-92a, Conn. Gen. Stats.;

drafting of a purchase contract;

negotiations both by telephone and in person and executing and recording of a contract.                                                    $3,200

"B. Services related to the $110,000 loan from CBT to the Metcalfe Glass Co., Inc. to provide the deposit money for the Hudson Street property including:

examination of title and preparation of title insurance policy;

preparation of mortgage instruments and supervision of their execution.                                                                    $  400

"Disbursements:

Title insurance premium                                                   $  291

Recording charges                                                         $   45

  "Total                                                                  $3,936"

contract barred him from later claiming damages for breach of contract. We disagree. "[T]he effect of a rescission is to extinguish the contract and to annihilate it so effectively that in contemplation of law it has never had any existence, even for the purpose of being broken. Accordingly, it has been said that a lawful rescission of an agreement puts an end to it for all purposes, not only to preclude the recovery of the contract price, but also to prevent the recovery of damages for breach of the contract. An election to rescind a contract waives the right to sue upon it. After rescission for a breach, there is no right to sue on the contract for damages for such breach." 17 Am. Jur. 2d, Contracts § 516, pp. 1002–1003. Furthermore, this court has stated that "[a] definite election to rescind a contract is final and operates as a waiver of any claim for damages for any breach of the contract"; *Gordon* v. *Indusco Management Corporation,* 164 Conn. 262, 266, 320 A.2d 811 (1973); and that " '[h]e who elects to rescind a contract can claim nothing under it.' *Jones* v. *Brinsmade,* 183 N.Y. 258, 262, 76 N.E. 22 [1905]; *Valente* v. *Weinberg,* 80 Conn. 134, 135, 67 Atl. 369 [1907]; *Janulewycz* v. *Quagliano,* 88 Conn. 60, 64, 89 Atl. 897 [1914]; 3 Black, Rescission (2d Ed.), § 704; Restatement, 2 Contracts, § 410, comment b, illustration 2; 12 Am. Jur. 1019, 1038; 13 C.J. 623, § 684; 17 C.J.S. 925, § 441." *Haaser* v. *A.C. Lehmann Co.,* 130 Conn. 219, 221, 33 A.2d 135 (1943).

Therefore, the trial court properly ruled that "the plaintiff's claims for expectancy and reliance damages . . . [could] not be sustained by reason of the plaintiff's unequivocal exercise of his right of rescission."

V

Finally, the plaintiff argues in his cross appeal that the trial court erred in awarding prejudgment inter-

est on the plaintiff's award from the time of his demand for rescission instead of from the time of the breach of the agreement to insure the property. We disagree. The trial court granted prejudgment interest at the statutory rate of 10 percent on the plaintiff's $157,630.59 award from January 8, 1986, the date the plaintiff rescinded the contract, to October 13, 1988, the date of judgment. "Interest 'may be recovered and allowed in civil actions . . . as damages for the detention of money after it becomes due and payable.' General Statutes § 37-3a." *Nor'easter Group, Inc.* v. *Colossale Concrete, Inc.,* 207 Conn. 468, 482, 542 A.2d 692 (1988). Furthermore, "[t]he allowance of interest as an element of damages is primarily an equitable determination and a matter within the discretion of the trial court." Id.; see *West Haven Sound Development Corporation* v. *West Haven,* 207 Conn. 308, 321, 541 A.2d 858 (1988); *King* v. *Board of Education,* 203 Conn. 324, 341, 524 A.2d 1131 (1987); *Milgrim* v. *Deluca,* 195 Conn. 191, 201, 487 A.2d 522 (1985); *Bertozzi* v. *McCarthy,* 164 Conn. 463, 467, 323 A.2d 553 (1973). The plaintiff's suit against the defendants is clearly a "civil action," and our review of the record reveals no abuse of discretion by the trial court. Thus, the trial court did not err in awarding the plaintiff prejudgment interest from January 8, 1986, to the date of judgment.

There is error on the appeal only in the amount of damages awarded the plaintiff, the judgment is set aside and the case is remanded with direction to render judgment as on file except as modified in accordance with this opinion; there is no error on the cross appeal.

In this opinion the other justices concurred.